(R.D. 11689)

AGRICOLAS DE MEXICO, S. DE R.L. DE C.V. *v.* UNITED STATES

Entry No. 7205, etc.

(Decided January 9, 1970)

*Stein & Shostak* (*Marjorie M. Shostak* and *Theophilus B. Audett* of counsel) for the plaintiff.

*William D. Ruckelshaus,* Assistant Attorney General (*Andrew P. Vance, Dominick Minerva,* and *Mollie Strum,* trial attorneys), for the defendant.

WATSON, Judge: This case is before the court on an appeal for reappraisement filed by the plantiff with respect to cantaloupes imported from Mexico at Laredo, Texas, during the period of March 25 through April 3, 1965.

The cantaloupes were examined by the appraiser and assessed with duty on the basis of whether they were of export quality No. 1 or export quality No. 2. Plaintiff claims that those cantaloupes which were found to be of grade No. 1 were, in fact, of a quality known as "Commercial Pack" which has a lower value than grade No. 1 but higher than grade No. 2 and consists of a mixture of cantaloupes of both first and second quality. Further, plaintiff asserts that the cantaloupes which were

graded No. 2 were cantaloupes of a lesser quality, known as "Mexico Pack" and have a lesser value than cantaloupes which are grade 2.

The parties have agreed, and I find, that export value, as defined in section 402(b) is the correct basis of appraisement and the merchandise is not included on the Final List, T.D. 54521.

Section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, reads as follows:

> (b) Export Value.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

The record in this case consists of the testimony of two witnesses called by the plaintiff, two witnesses called by the defendant, ten documentary exhibits introduced by plaintiff and two documentary exhibits introduced by the defendant.

Plaintiff's first witness was Mr. Carlos Chapa, a licensed customhouse broker who entered the merchandise at bar for the plaintiff.

He testified that every week the various shippers in Mexico reported the price that they were paying to growers in the different regions and from these reports the customs appraiser would then determine what values would be used for the different qualities of cantaloupe for each weekly period. He stated that they quoted prices for Exportacion which they called Commercial Pack and the Mexico Pack which they called Nacional. Other shippers were also reporting a price for their No. 1 grade and some a No. 1 and a No. 2 grade of melons.

Mr. Chapa testified that he was advised by the appraiser, Mr. Kelly, that the Exportacion or Commercial Pack would be valued as a No. 1 grade cantaloupe and the Mexico Pack or Nacional would be graded as "other than No. 1".

He stated that in previous years the customs officials had recognized, for appraisement, four different classes of cantaloupe, No. 1, Commercial, No. 2 and Mexico Pack, but that in 1965, at the time of entry of the merchandise at bar, only two grades were recognized, No. 1 and other than No. 1.

On cross-examination, Mr. Chapa stated that he had never seen a commercial grading operation, nor had he ever visited the farm where the cantaloupes were grown.

Mr. Chapa identified defendant's exhibit A as a copy of a letter dated April 6, 1961, from the Bureau of Customs and stating that only two classes of cantaloupes will be recognized for appraisement purposes. He testified that customs did not always recognize the same number of grades for appraisement purposes but always notified the trade of any change.

On redirect, Mr. Chapa identified plaintiff's exhibit 3 as a copy of a letter from the Bureau of Customs, dated February 23, 1962 which stated that three grades of melons would be considered for appraisement purposes, No. 1, No. 2 and Culls (Mexican market).

In both defendant's exhibit A and plaintiff's exhibit 3, the letters stated that "Commercial Pack" cantaloupes would be graded as grade 1.

Plaintiff's second witness, Mr. Nicholas Rocha-Freyre, testified (in Spanish through an interpreter) that he was general manager of the company, Productos Agropecuarios de Mexico S. de R.L. de C.V. (hereinafter referred to as Productos). He was responsible for the administration of the business in general and for decision regarding purchases and sales.

In 1965 Productos purchased cantaloupes from growers in the Zitacuaro and Apatzingan regions of Mexico. After the cantaloupes are delivered to the sheds, they are classified according to quality of grade and size and the growers are paid according to the number of boxes and crates of each quality and size delivered. Productos separates the cantaloupes into three classes, Exportacion, which they refer to as Commercial or combination; Nacional or Mexico Pack; and Pachanga or Culls.

Commercial or Exportacion brings the highest price and is packed in sizes of 27, 36, 45, 56 and 64 melons to the crate.

Mr. Rocha testified that Productos purchased Commercial and Mexico Pack quality melons for export to the United States. He stated that other sheds packed or purchased four grades of cantaloupes, No. 1, No. 2, Nacional or Mexico Pack and Pachanga. He explained the difference of the quality of the melons in that grade No. 1 was perfect in configuration and clear in color, grade 2 has some stains on its outside, the result of excess sun or too much shade; Mexico Pack quality has larger stained areas and the Pachanga melon is one that has extensive damage making it largely unfit for use other than as animal feed. Usually it is purchased as a favor to the grower at a nominal price and then discarded.

The witness stated that the Commercial grade which Productos packed was a combination of grade 1 and grade 2 melons and that Mexico Pack was a grade lesser than grade 2.

He testified that Productos paid lower prices for cantaloupes than

other buyers. These prices are made known to the growers by being announced on a board at the shed and by sending people to talk to the farmers and offer them prices.

He explained that Productos paid a lower price because it combined grades 1 and 2 melons while the other sheds packed grades 1 and 2 separately. The price paid for Nacional or Mexico Pack was more or less the same.

As evidence of the prices Productos paid for its cantaloupes, plaintiff introduced, as collective exhibit 4, 1116 copies of receipts from their packing shed in Tusantla, Mexico. Mr. Rocha identified them as such and stated that while some of the receipts were for cantaloupes which are part of the importation at bar, it would be impossible to say which ones they were.

Mr. Rocha stated that the class of melons described as "Gracias" on the invoices was Nacional or Mexico Pack and those described as "Pearl" were export or combination.

On cross-examination, Mr. Rocha testified that during the year 1965 Productos did no financing of farmers in the Tusantla region and he did not know if anyone else had financed them.

Productos was formed in February of 1965 when it purchased the Tusantla sheds from one Jose Garcia. Mr. Garcia remained with the company as an employee.

Mr. Rocha stated that he was also a stockholder and the manager of Agricolas de Mexico, the importer of the merchandise at bar. Agricolas served as the representative of Productos.

The defendant called as its first witness, Mr. Earl W. Simmons, a customs agent stationed in Laredo, Texas. As part of his duties in connection with the appraisement of cantaloupes, he made annual trips to the growing areas in Mexico to verify prices and investigate value. In 1965, Mr. Simmons was in Mexico from April 12 through April 25, and submitted his report, defendant's collective exhibit B, to the appraiser.

He testified that he found prices quoted in the growing areas were in three categories, Exportacion, Nacional and Pachanga and that the prices were normally displayed on a blackboard or bulletin board in the dump area of the packing shed.

On the basis of informal conversations with the growers in the area, the witness concluded that the Exportacion cantaloupe was exported while the Nacional was destined for the Mexican market.

Mr. Harry G. Kelly, District Director of Customs, Houston, Texas, was called as a witness by the defendant. In February, 1965, as a customs liaison officer, Mr. Kelly made the annual cantaloupe survey trip to Mexico. The purpose of this trip was, in Mr. Kelly's words to

"develop information in the production areas of Mexico to insure that this fruit was properly appraised, to see, to determine what the conditions are. They change annually, to explore the problem that had arisen with the appraisement of certain fruits coming from the various areas of Mexico."

He spent eleven days in Mexico and observed cantaloupes in Cuernavaca, Zitacuaro, Tusantla, Apatzingan and Neuvo Italia. In Tusantla he found a single packing shed that was handling the grade and packing of marketable cantaloupes. The shed was run by a Manuel Correa who claimed to be the sole owner. Mr. Correa told Mr. Kelly that he was purchasing his own fruit and he was purchasing fruit from others and that he was financing. He purchased fruit only from growers whom he financed.

As a result of his investigation, Mr. Kelly concluded that in the arrangement for the growth and sale of cantaloupes, "there was not an unencumbered sales as one would expect to find in a market." Nor, was there a market in the Zitacuaro area where he found only one shed, which bought no melons, but merely packed its own fruit.

Mr. Kelly saw four types of cantaloupe while in Mexico, Pearls, Pachangas, No. 2 Export quality and No. 1 Export quality. He found that what some sheds were packing as Mexico Pack were, in fact, the same as other sheds were packing as No. 2 Export quality.

He testified that he observed that what Productos Agropecuarios was packing as a Commercial Pack grade of cantaloupe was the same quality fruit that everyone else in the trade called a No. 1, and Productos was paying the same prices that the rest of the trade was paying for No. 1. Mr. Kelly further stated that "based on examination of all of the sheds that were exporting to the United States, I concluded that the so-called Mexico Pack was in fact Export No. 2 quality that was so recognized by everyone in the industry."

On cross-examination Mr. Kelly stated that he appraised the cantaloupes which are at issue before the court. He included in his appraisement the cost incurred by the packing shed in putting the merchandise in condition, packed, ready for exportation to the United States, including the cost of packing materials.

At the close of Mr. Kelly's testimony, plaintiff recalled Mr. Rocha as a rebuttal witness. He stated that Manuel Correa, whom Mr. Kelly had described as the owner and manager of the Tusantla packing shed, was, in fact, nothing more than a buying agent for Productos and did not own or manage any packing shed of Productos Agropecuarios in 1965 or before.

The issue before this court is whether plaintiff has successfully established that the merchandise at bar, cantaloupes described as

Exportacion or Commercial Pack and Nacional or Mexico Pack, is of different quality and value than the grades No. 1 and No. 2 at which the melons were appraised.

Both by statute and judicial interpretation the action of the appraiser is clothed with a presumption of correctness which is not overcome until the appraiser's findings are shown to be erroneous and claimed values are established as correct. 28 U.S.C., section 2633, *Brooks Paper Company* v. *United States*, 40 CCPA 38, C.A.D. 495 (1952), *Kenneth Kittleson* v. *United States*, 40 CCPA 85, C.A.D. 502 (1952), *Kobe Import Co.* v. *United States*, 42 CCPA 194, C.A.D. 593 (1955). To overcome this presumption plaintiff must meet every material issue involved in the case and if he fails, the value fixed by the appraiser remains in full force and effect. *Brooks Paper Company*, *supra*.

Plaintiff here has offered extensive evidence as to the business practices of Productos Agricolas, the actual party of interest in this case, and has further offered evidence as to the prices at which it purchased cantaloupes during the period the melons at bar were exported to the United States.

However, this alone has never been sufficient in sustaining the burden of proof of establishing the statutory requirements of export value. *United States* v. *Manahan Chemical Co., Inc.*, 24 CCPA 53, T.D. 48333 (1936), *Sears, Roebuck & Co. et al.* v. *United States* 31 CCPA 36, C.A.D. 246 (1943).

Simply because "Productos" was able to purchase the subject merchandise at prices lower than those appraised, does not establish that such or similar merchandise was sold or offered for sale in accordance with the statutory requirements of section 402(b), *supra*. As was stated in *Renee Antiques, Inc., et al.* v. *United States*, 56 Cust. Ct. 646, R.D. 11151 (1966), "it was incumbent upon plaintiffs to show not the manner in which they bought, but the manner in which such or similar merchandise was sold or offered for sale to all purchasers."

From the evidence, it seems doubtful that the merchandise at bar was freely sold by the growers to Productos as was envisioned by section 402(b), *supra*. We have the testimony by former appraiser, Kelly, that he found in February 1965 one Manuel Correa to be in charge of the Tusantla packing shed, contradicted by the testimony of Mr. Rocha that his firm, Productos Agropecuarios owns the shed and that Mr. Correa is only employed by him to get the growers to sell their melons to Productos. We have the report of Customs Agent Simmons (defendant's collective exhibit B) that states that in April of 1965 Mr. Correa held himself out to be the manager of the Tusantla shed. And finally, there are the invoices (plaintiff's collective exhibit

4) which show Mr. Correa to be a grower and seller of cantaloupes with numerous sales made to Productos.

On the basis of their investigations and conversations with Mr. Correa and with managers and owners of other packing sheds, Mr. Kelly and Mr. Simmons have both testified that they failed to find the kind of open market for the sale of cantaloupes that was envisioned by Congress in defining export value in section 402(b) of the Tariff Act of 1930, *supra*.

Plaintiff has argued to the contrary that the melons were bought on the open market from farmers who were free to sell to Productos or not. Yet, it seems that the shed in Tusantla was the only one in the area and the farmers had no one else with whom to bargain. Plaintiff too, has admitted, *supra*, that Productos paid a lesser price for its cantaloupes than did other sheds. Nothwithstanding the affidavits submitted by plaintiff (plaintiff's exhibits 5, 6, 7, 8, 9 and 10) from farmers who sold to Productos, I find that plaintiff has failed to overcome the presumption of correctness attaching to the appraiser's action.

Moreover, plaintiff has failed to establish that the cantaloupes at bar were in fact of a different grade than that found by the appraiser. The record is devoid of any affirmative evidence to establish that *these cantaloupes*, the ones covered by the entries at bar, were, in fact, inferior to what defendant has designated No. 1 and No. 2.

The record does not contain sufficient evidence to overcome the presumptively correct value found by the appraiser on the basis of export value.

I find as facts upon the record presented:

1. That the imported merchandise consists of cantaloupes which were exported by Productos Agropecuarios de Mexico, S. de R.L. de C.V. to the Uniited States, and entered for consumption at Laredo, Texas during the period beginning March 29, 1965 through April 5, 1965. The importer of record is Agricolas de Mexico S. de R.L. de C.V.

2. That the merchandise does not appear on the Final List promulgated by the Secretary of the Treasury, T.D. 54521.

3. That the merchandise was appraised on the basis of export value as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956.

4. That the cantaloupes which are described by the importer as "Gracias" label, Mexico Pack, are known as export quality No. 2 and the cantaloupes on entry No. 7279 described by the importer as "Pearl" label, Commercial Pack, are known as export quality No. 1 and were appraised on that basis by the appraiser at the port of Laredo, Texas.

I conclude as matters of law:

1. That plaintiff has failed to sustain the burden of overcoming the presumptively correct appraised values.

2. That export value, as that value is defined in section 402(b) of the Tariff Act of 1930 as amended by the Customs Simplification Act of 1956, is the proper basis for the determination of the value of the merchandise here under consideration and that such values are the appraised values.

Judgment will be entered accordingly.